10 Cal.4th 698 (1995)
896 P.2d 1365
42 Cal. Rptr.2d 355
In re M.S., a Minor.
THE PEOPLE, Plaintiff and Respondent,
v.
M.S., Defendant and Appellant.
In re A.G., a Minor.
THE PEOPLE, Plaintiff and Respondent,
v.
A.G., Defendant and Appellant.
Docket No. S035200.
Supreme Court of California.
July 3, 1995.
*706 COUNSEL
Stewart C. Pollack, Jean Allan, under appointments by the Supreme Court, Jeff Brown, Public Defender, and Donna Teshima, Deputy Public Defender, for Defendants and Appellants.
John T. Philipsborn, Dennis P. Riordan, Linda F. Robertson, Katzoff & Riggs, Robert R. Riggs, Frye & Alberts and E. Lynn Machow as Amici Curiae on behalf of Defendants and Appellants.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, Clifford K. Thompson and Joanne S. Abelson, Deputy Attorneys General, for Plaintiff and Respondent.
Heller, Ehrman, White & McAuliffe, Stephen Hankins, Robert E. Borton, Diane T. Chin, Joshua B. Baker, Angelo N. Ancheta, Doreena P. Wong, Kathryn K. Imahara, Stanley Mark, Elizabeth R. OuYang, LeBoeuf, Lamb, Greene & MacRae, Dean Hansell, Aaron C. Gundzik, Alex Fukui, Lisa A. Anderson, Edward M. Chen, Matthew A. Coles, Paul Hoffman, Erwin Chemerinsky, Mary Ellen Gale, Mark D. Rosenbaum, Joyce M. Norcini, Robert J. Thyken, Jr., Ruth L. Lansner, Steven M. Freeman, Tzivia Schwartz, Barbara H. Bergen, Brian Levin, J. Richard Cohen, Richard Nakamura, Dysart & Dubick and Sherri A. Groveman as Amici Curiae on behalf of Plaintiff and Respondent.
OPINION
WERDEGAR, J.
This case requires us to address various constitutional challenges to Penal Code sections 422.6 and 422.7, two of California's "hate crime" statutes.[1] The juvenile court found that M.S. and A.G., the minors, violated section 422.6 by their actions in the course of a melee early one morning in the Castro District of San Francisco and further found true *707 allegations under section 422.7. The Court of Appeal rejected the minors' challenges to the constitutionality of sections 422.6 and 422.7. We likewise conclude the statutes are constitutionally valid.

FACTS
The incident giving rise to this case was the subject of conflicting testimony. Members of each side of the fracas testified it stemmed from the other's verbal provocations; each portrayed the other as the aggressor. (1) As an appellate court, we view the facts in the light most favorable to the judgment. (People v. Mincey (1992) 2 Cal.4th 408, 432 [6 Cal. Rptr.2d 822, 827 P.2d 388].)
On August 20, 1990, around 2:30 a.m., Jonathan Ebarb, Christopher Minor, Bill Camilo, Dennis Graff and Christopher McMillen were riding in Ebarb's flatbed truck to Little Orphan Andy's, a restaurant on 17th Street near Castro Street in San Francisco. The Castro District is known as a predominantly gay neighborhood, and Ebarb and his companions were homosexual. They had just gotten off work and planned to eat breakfast at the restaurant.
As Ebarb's truck proceeded west along 17th Street, Minor and McMillen, who were sitting in the flatbed, heard male and female voices yelling antigay epithets in a "hateful" sounding tone. Christopher Minor saw two men and *708 two women on the street. One of the women, later identified as M.S., had long curly hair cut short around the ears; she wore a leather dog collar, army boots and a ring through her nose. The other woman, A.G., was petite, with short, bleached-blonde hair, and wore a bomber jacket and army boots. The two men were later identified as Miles and Rosenberg. Ebarb parked his truck and he and his companions hurried toward the restaurant. Anticipating trouble, Christopher Minor asked a waiter to telephone police.
The minors and Miles and Rosenberg continued to shout antigay epithets, threatening to "beat up" the gay men. From the doorway of the restaurant, Ebarb saw the minors, with Miles and Rosenberg, surround his truck. Rosenberg and M.S. began to strike the truck, and Ebarb yelled at them to stop. The minors, Miles and Rosenberg crossed the street, moving toward the gay men. M.S. screamed, "We are going to kill you, you are all going to die of AIDS." A.G. yelled, "We are going to get you faggots." Miles and Rosenberg issued similar threats. The four took aggressive stances near the gay men. Holding a beer bottle, A.G. lunged at Ebarb and dared him to hit her. M.S. stood with her fists clenched at chest level. Christopher Minor stood nearby, having obtained a milk crate to use defensively. A.G. reached up and clawed Ebarb's face with her left hand. Rosenberg attacked Christopher Minor, who attempted to fight back with the milk crate and to blow a whistle for help.
After a few moments, during which the fight continued, the minors and Miles and Rosenberg retreated down 17th Street. M.S. soon turned around and yelled epithets and declared, "We are going to get you." At that point, the four returned toward the restaurant. Christopher Minor called out, "Why are you doing this? You leave the neighborhood, leave us alone." Minor slipped and fell on the sidewalk, whereupon M.S., A.G., Miles and Rosenberg kicked him repeatedly. Ebarb came to Minor's aid, but was hit from behind and fell to the ground. Rosenberg delivered a "football" kick to the side of Ebarb's head, causing him to lose consciousness. Ebarb was treated at Davies Medical Center for lacerations to the ear.
A petition under Welfare and Institutions Code section 602 was filed against both minors. Each petition alleged felonious assault of Jonathan Ebarb and Christopher Minor with a deadly weapon or by force likely to produce great bodily injury (§ 245, subd. (a)(1)) (counts 1 and 2), felonious battery of Jonathan Ebarb causing serious bodily injury (§ 243, subd. (d)) (count 3), and interference with Ebarb's and Minor's civil rights, a misdemeanor (§ 422.6) (count 4). Each of the felony charges was joined with an allegation, pursuant to section 422.7, that the offense had been committed because of the victims' sexual orientation. The proceedings against the minors were consolidated for jurisdictional purposes.
*709 Following a contested jurisdictional hearing, the juvenile court found true all of the charges and enhancing allegations against both minors.[2] The case involving A.G. was then severed and transferred to Alameda County, where she lived. A.G. was continued as a ward of the court, which suspended a five-year, two-month commitment to the California Youth Authority[3] and placed A.G. on probation, subject to a term in custody (a condition later deleted). The juvenile court declared M.S. a ward of the court and imposed a six-year, two-month commitment to the California Youth Authority. The court stayed execution of the commitment, placed M.S. on probation conditioned on her commitment to juvenile hall for six months, and ordered her to perform five hundred hours of community service. Several weeks later the juvenile court stayed the remaining commitment time and ordered M.S. released from custody.
The minors' cases were consolidated again on appeal. The Court of Appeal affirmed the juvenile court, rejecting the minors' constitutional challenges to sections 422.6 and 422.7.

DISCUSSION

Overbreadth
(2a) The minors contend section 422.6 is unconstitutionally overbroad, in that it punishes speech falling outside the limited category of "true threats" punishable consistently with the First Amendment. (See People v. Mirmirani (1981) 30 Cal.3d 375, 388, fn. 10 [178 Cal. Rptr. 792, 636 P.2d 1130].) The minors may raise this challenge even though they do not claim they themselves were punished solely for their speech. (3) Although constitutional rights are generally said to be personal, a well-established exception is found in the overbreadth doctrine associated with First Amendment jurisprudence. (Wurtz v. Risley (9th Cir.1983) 719 F.2d 1438, 1440.) Under this doctrine, litigants may challenge a statute not because their own rights of free expression are violated, but because the very existence of an overbroad statute may cause others not before the court to refrain from constitutionally protected expression. (Broadrick v. Oklahoma (1973) 413 U.S. 601, 612 [37 L.Ed.2d 830, 839-840, 93 S.Ct. 2908]; Wurtz v. Risley, supra, 719 F.2d at p. 1440.)
*710 (4) To succeed in a constitutional challenge based on asserted overbreadth, the minors must demonstrate the statute inhibits a substantial amount of protected speech. (New York v. Ferber (1982) 458 U.S. 747, 768-769 [73 L.Ed.2d 1113, 1129-1130, 102 S.Ct. 3348].) "[O]verbreadth ... must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (Broadrick v. Oklahoma, supra, 413 U.S. at p. 615 [37 L.Ed.2d at p. 842].) We are bound, if possible, to construe a statute in a fashion that renders it constitutional. (See People v. Hansel (1992) 1 Cal.4th 1211, 1219 [4 Cal. Rptr.2d 888, 824 P.2d 694] ["`it is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.]'"].)
(5) As the minors acknowledge, the state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. (People v. Mirmirani, supra, 30 Cal.3d at p. 388, fn. 10; see Watts v. United States (1969) 394 U.S. 705, 706-708 [22 L.Ed.2d 664, 666-668, 89 S.Ct. 1399].) In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, "`communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs....'" (Shackelford v. Shirley (5th Cir.1991) 948 F.2d 935, 938, quoting Tribe, American Constitutional Law (2d ed. 1988) § 12-8, pp. 836-837.) As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. (Shackelford v. Shirley, supra, 948 F.2d at p. 938.) Nonetheless, statutes criminalizing threats must be narrowly directed against only those threats that truly pose a danger to society. (People v. Mirmirani, supra, 30 Cal.3d at p. 388, fn. 10.)
A threat is an "`expression of an intent to inflict evil, injury, or damage on another.'" (U.S. v. Orozco-Santillan (9th Cir.1990) 903 F.2d 1262, 1265.) When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection. (Id. at pp. 1265-1266; In re Steven S. (1994) 25 Cal. App.4th 598, 607 [31 Cal. Rptr.2d 644]; Wurtz v. Risley, supra, 719 F.2d at p. 1441 ["It is true that threats have traditionally been punishable without violation of the [F]irst [A]mendment, but implicit in the nature of such punishable threats is a reasonable tendency to produce in the victim a fear that the threat will be carried out."]; see also NAACP v. Claiborne Hardware Co. (1982) 458 U.S. *711 886, 927 [73 L.Ed.2d 1215, 1245, 102 S.Ct. 3409] [involving public speeches advocating violence].)
In contrast, "political hyperbole" of the sort at issue in Watts v. United States, supra, 394 U.S. 705 (Watts) remains within the "marketplace of ideas" protected by the First Amendment. (See U.S. v. Gilbert (9th Cir.1987) 813 F.2d 1523, 1531.) In Watts, a young man attending a political rally in Washington, D.C., during the time of the Vietnam War, informed a group of attendees that he had just received his draft notice to report for induction and declared he would not go. "If they ever make me carry a rifle," he stated further, "the first man I want to get in my sights is L.B.J." His listeners laughed. (Watts, supra, 394 U.S. at pp. 706-707 [22 L.Ed.2d at pp. 666-667].) In reversing Watts's conviction for threatening the life of the President, the United States Supreme Court considered the context and expressly conditional nature of the statement, as well as the listeners' reaction. The high court concluded the statement, rather than a threat, was merely a "`very crude offensive method of stating ... political opposition.'" (Id. at pp. 707-708 [22 L.Ed.2d at p. 667].)
(2b) The minors contend, as they did before the Court of Appeal, that section 422.6 is overbroad because it is insufficiently specific as to the person or persons threatened. We read their contention as incorporating a challenge on grounds of vagueness. The Court of Appeal interpreted "group of persons" in section 422.6, subdivision (c) (see fn. 1, ante) to mean a specific group of individuals, not abstract groups or protected classes, as the minors contended. Its interpretation is sound. Reading the statute as a whole, we are persuaded the Legislature meant to proscribe "true threats" as traditionally understood, not what might be termed "group libel." So read, section 422.6 is neither overbroad nor vague in this respect. We cannot agree with minor A.G.'s suggestion in this regard that the Legislature's expressed desire, in enacting California's hate crime statutes, to afford greater protection to disfavored minority groups is itself substantial evidence of an unconstitutional intent to enact an overbroad law.
The minors also contend, as they unsuccessfully did before the Court of Appeal, that section 422.6 is overbroad because it fails to require that a punishable threat be unconditional and imminent. They suggest the requirement in subdivision (c) of section 422.6, that the offender have the "apparent ability to carry out the threat," fails to satisfy the requirement of imminence. The minors err, however, in assuming the First Amendment always requires the threatened harm be imminent for the threat to be constitutionally punishable. It does not.
The error stems from an overly expansive reading of a decision of the federal Court of Appeals for the Second Circuit. In United States v. Kelner *712 (2d Cir.1976) 534 F.2d 1020 [34 A.L.R.Fed. 767] (Kelner), defendant was convicted of transmitting in interstate commerce a threat to injure Yasser Arafat, who was then planning to visit the United States.[4] On appeal defendant argued that, because he did not intend to carry out his threats, the statements he made were not threats within the meaning of the statute. The Court of Appeals rejected his argument, concluding proof of specific intent to carry out the threat is not constitutionally required so long as circumstances demonstrate the threats "are so unambiguous and have such immediacy that they convincingly express an intention of being carried out." (534 F.2d at p. 1027, italics in original.) The Kelner court concluded the statute could be enforced as long as "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." (Kelner, supra, 534 F.2d at p. 1027.)
The minors read Kelner as requiring any constitutionally valid statute punishing the making of threats to contain the element of immediacy or imminence. They purport to derive this requirement from the doctrines governing speech likely to incite imminent lawless action (see Brandenburg v. Ohio (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 433-434, 89 S.Ct. 1827] (Brandenburg)) and "fighting words," i.e., words that by their very utterance inflict injury or tend to incite an immediate breach of the peace (see Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 571-572 [86 L.Ed. 1031, 1034-1035, 62 S.Ct. 766] (Chaplinsky)). Kelner, however, is distinguishable from the authorities pertaining to either incitement or fighting words, as it construed a statute lacking any requirement of specific intent. (See fn. 4, ante.) In order to restrict the statute's application to true threats, as Watts made clear the Constitution mandates, Kelner imposed the immediacy requirement quoted above. (See Shackelford v. Shirley, supra, 948 F.2d at p. 939.) Moreover, Kelner's requirement of imminence or immediacy must be read in light of the facts of that case. When the defendant made the threat, his victim had not yet even set foot in the United States, and there was no evidence he was aware of the threat. (Kelner, supra, 534 F.2d at pp. 1021, fn. 2, 1022.) Yet the Kelner court found the requisite immediacy in the fact the defendant professed the present ability to carry out the threat to kill Arafat: "`We have people who have been trained and who are out now....'" (Id. at p. 1028.) Sections 422.6 and 422.7 each contain the element of present or apparent ability to carry out the threat, and are thus consistent with Kelner.
Furthermore, in contrast to the federal statute at issue in Kelner, subdivision (a) of section 422.6 expressly requires that a punishable threat be *713 "willful." In People v. Lashley (1991) 1 Cal. App.4th 938, 949 [2 Cal. Rptr.2d 629] (Lashley), the Court of Appeal held that, to violate the statute, one must specifically intend, by means of threats of violence to another person, to invade interests protected by constitutional or statutory authority. The Lashley court based its holding on the similarity of section 422.6 to federal and Massachusetts civil rights statutes, after which the California hate crimes statutes were modeled. Courts have construed the federal and Massachusetts laws to contain a requirement that the defendant specifically intend to interfere with the victim's legally protected rights; the Lashley court found their reasoning persuasive in its interpretation of similar language in section 422.6. (Lashley, supra, 1 Cal. App.4th 938, 947-949, citing Screws v. United States (1945) 325 U.S. 91, 101 [89 L.Ed. 1495, 1502-1503, 65 S.Ct. 1031, 162 A.L.R. 1330], United States v. Ehrlichman (D.C. Cir.1976) 546 F.2d 910, 921 [178 App.D.C. 144, 39 A.L.R.Fed 604], and Com. v. Stephens (1987) 25 Mass. App. 117 [515 N.E.2d 606, 609].) The Lashley court recognized that, unlike section 422.6, section 422.7 does not contain the word "willfully." It reasoned, however, that the phrase, "`if the crime is committed ... for the purpose of ... interfering with [the] free exercise or enjoyment of any right,' unequivocally defines a specific intent crime." (Lashley, supra, 1 Cal. App.4th at p. 949.) We find the Lashley court's reasoning persuasive and, accordingly, conclude sections 422.6 and 422.7 require proof of a specific intent to interfere with a person's right protected under state or federal law.[5] This requirement helps to protect against unconstitutional application to protected speech. (See Shackelford v. Shirley, supra, 948 F.2d at p. 939; U.S. v. Gilbert, supra, 813 F.2d 1523, 1529.)
Given, therefore, the specific intent requirements in the two California statutes at issue in this case, the concerns are absent that motivated the *714 Kelner court to insist on evidence of the threat's imminence or immediacy, in prosecutions under a federal statute lacking such a mens rea requirement, and we decline to infer such a requirement.
(6), (2c) As the Attorney General and certain amici curiae[6] have urged, despite superficial similarities, threats are not, for First Amendment purposes, treated identically with either fighting words or expression tending to incite imminent lawless action. Both fighting words and incitement have expressive value, the former as provocative communication of a most effective sort, the latter as communication aimed at moving the listener to act. The First Amendment protects the inherent communicative value in each of the two kinds of expression up to the point at which the state's compelling interest in maintaining order must outweigh the speaker's freedom of expression. This is the purpose served by the rule in Brandenburg, supra, 395 U.S. at page 447 [23 L.Ed.2d at pp. 433-434], that to forfeit constitutional protection the speech must be "directed to inciting ... imminent lawless action" and must be likely to do so, and the corresponding rule of Chaplinsky, supra, 315 U.S. at page 572, that fighting words lose First Amendment protection only when, [87 L.Ed. at pp. 1035-1036] by their very utterance, they "inflict injury or tend to incite an immediate breach of the peace."
Violence and threats of violence, by contrast, fall outside the protection of the First Amendment because they coerce by unlawful conduct, rather than persuade by expression, and thus play no part in the "marketplace of ideas." As such, they are punishable because of the state's interest in protecting individuals from the fear of violence, the disruption fear engenders and the possibility the threatened violence will occur. (R.A.V. v. St. Paul (1992) 505 U.S. 377, 388 [120 L.Ed.2d 305, 321, 112 S.Ct. 2538].) As long as the threat reasonably appears to be a serious expression of intention to inflict bodily harm (U.S. v. Orozco-Santillan, supra, 903 F.2d at pp. 1265-1266), and its circumstances are such that there is a reasonable tendency to produce in the victim a fear the threat will be carried out (Wurtz v. Risley, supra, 719 F.2d at p. 1441), the fact the threat may be contingent on some future event (e.g., "If you don't move out of the neighborhood by Sunday, I'll kill you") does not cloak it in constitutional protection. (See U.S. v. Malik (2d Cir.1994) 16 F.3d 45, 49; People v. Gudger (1994) 29 Cal. App.4th 310, 321-322 [34 Cal. Rptr.2d 510].) Section 422.6, therefore, is not unconstitutional for lacking a requirement of immediacy or imminence.
(7) Under section 422.6, for a conviction based on speech alone, the prosecution must prove the speech itself threatened violence and the defendant had the "apparent ability" to carry out the threat. (§ 422.6, subd. (c).) As *715 noted above, the Court of Appeal construed the latter phrase to encompass "a requirement that the victim reasonably fear for his or her safety," concluding this construction eliminated doubt as to the statute's constitutionality. The Court of Appeal's formulation would apparently require that the victim actually, as well as reasonably, entertain such fear. The Attorney General argues the Court of Appeal erred in imposing a requirement of subjective experience of fear. We agree that whether section 422.6 is violated in a given case should not depend on the robustness or susceptibility of the victim. We therefore construe the phrase "apparent ability" objectively, as implying the threat must be one that would reasonably tend to induce fear in the victim. (Cf. Wurtz v. Risley, supra, 719 F.2d at p. 1441.)
The minors argue that a construction of the phrase "apparent ability" to encompass the element of a reasonable tendency to induce fear would contradict legislative intent. Civil Code section 52.1, the Bane Act civil counterpart of section 422.6, recognizes a private right of action for damages and injunctive relief for interference with civil rights. Subdivision (j) of Civil Code section 52.1 provides that speech alone is insufficient to support such an action, except upon a showing that the speech itself threatens violence against a specific person or group of persons, the person or group of persons against whom the speech is directed "reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence has the apparent ability to carry out the threat." (Civ. Code, § 52.1, subd. (j), italics added.) The minors reason the omission from section 422.6 of the "fear" element of Civil Code section 52.1 was a deliberate legislative choice precluding the courts from inferring that element to clarify the section 422.6 element of "apparent ability." They further suggest "apparent ability," in section 422.6, refers only to the means of carrying out the threat, because in certain legislative history "possession of a weapon" is used to illustrate the concept of apparent ability. (Sen. Rules Com., Analysis of Assem. Bill No. 63 (1987-1988 Reg. Sess.), as amended Sept. 8, 1987.) From these circumstances they reason "apparent ability" was not intended to encompass a requirement of "reasonable fear."
The minors' arguments are not persuasive. The presence of the express "reasonable fear" element, in addition to the "apparent ability" element, in Civil Code section 52.1, governing civil actions for damages, most likely reflects the Legislature's determination a defendant's civil liability should depend on the harm actually suffered by the victim. That consideration is absent in a criminal prosecution under section 422.6.
Both "apparent ability to carry out a threat" and "having a reasonable tendency to induce fear in a victim" are essentially two aspects of the same *716 idea. A person who, in making a threat of violence, displays the apparent ability to carry out the threat ordinarily will also reasonably tend to induce fear of such violence in the victim. We conclude section 422.6 is not overbroad as we have construed it.

Causation

Summary
(8) Both sections 422.6 and 422.7 require that the defendant specifically intend to deprive the victim of protected rights "because of" the victim's protected characteristic. Neither statute specifies whether that intent must be the sole reason behind the defendant's act or, if not, to what degree it must have motivated the defendant. The Court of Appeal construed "because of" to mean the defendant's discriminatory purpose must have been a "substantial factor" in the defendant's selection of the victim. All parties argue the Court of Appeal erred in this construction. They differ, however, on the correct interpretation of the statutory language.
The minors first contend the phrase "because of" as used in sections 422.6 and 422.7 is unconstitutionally vague, in that it fails to provide either adequate notice of the nature of the prohibited motive or sufficient guidelines for law enforcement. As to the substance of the phrase, they argue it must be read to require proof the victim would not have been selected but for his or her protected characteristic. The Attorney General, for his part, vigorously disputes the minors' claim of vagueness and urges the statute requires only proof the victim's characteristic contributed to the underlying criminal conduct.
As discussed below, we conclude the statutes are sufficiently clear to meet due process requirements. The language of causation employed in sections 422.6 and 422.7 ("because of") is commonly and properly used to indicate that an event, in this case the crime, was caused in fact by something, in this case the accused's prohibited bias. As we shall also discuss, we do not find in the statutes or the Constitution a requirement that the prohibited motivation be the predominant or exclusive cause of the offense. Instead, a crime with multiple concurrent causes is still done "because of" bias, and properly chargeable under sections 422.6 and 422.7, if the prohibited bias was a substantial factor in the commission of the crime.

Vagueness
The minors contend that, in employing the term "because of," sections 422.6 and 422.7 violate due process requirements because they fail to *717 provide a reasonable degree of certainty of meaning. (See Lanzetta v. New Jersey (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618].) This failure, they argue, leaves the statutes susceptible of arbitrary or discriminatory enforcement and overbroad application. We disagree.
"Because of" is a term in common usage. It connotes a causal link between the victim's characteristic and the offender's conduct, and resembles language found in other civil rights and antidiscrimination statutes. (See, e.g., Gov. Code, § 12940 [prohibiting discrimination in employment because of race, religious creed, color, ancestry, etc.]; 42 U.S.C. § 2000e-2 [prohibiting discrimination in employment because of race, color, religion, sex or national origin]; 18 U.S.C. § 245(b)(2) [prohibiting willful injury, intimidation, or interference with any person because of his or her race, color, religion or national origin and because he or she has been engaging in specified protected activities]; 42 U.S.C. § 3631 [prohibiting interference with any person engaged in housing-related activities because of his or her race, color, religion, sex, handicap, familial status or national origin]; Ore. Rev. Stat. § 166.165 [prohibiting intimidation because of actor's perception of another's race, color, religion, national origin or sexual orientation]; cf. 18 U.S.C. § 242 [prohibiting deprivation of legal rights of another person on account of alienage or by reason of his or her race or color].) We have found no authority holding any of these similar formulations unconstitutionally vague. To the contrary, the Oregon Supreme Court upheld that state's hate crime statute against a vagueness challenge, observing the statute "expressly and unambiguously requires the state to prove a causal connection between the infliction of injury and the assailants' perception of the group to which the victim belongs." (State v. Plowman (1992) 314 Ore. 157 [838 P.2d 558, 561, 22 A.L.R.5th 835], italics in original.) The same phrase in California's hate crimes statute is equally unambiguous. We think the phrase "because of" in sections 422.6 and 422.7 gives the person of ordinary intelligence a reasonable opportunity to know what the statutes prohibit. (See Grayned v. City of Rockford (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227-228, 92 S.Ct. 2294].)
The minors likewise do not persuade us the statutes provide insufficiently definite guidelines to constrain their enforcement. When definite guidelines are absent, a criminal statute may deny due process by allowing a "`standardless sweep'" by which police, prosecutors and juries may indulge their personal predilections. (Kolender v. Lawson (1983) 461 U.S. 352, 358 [75 L.Ed.2d 903, 909-910, 103 S.Ct. 1855].) Such was the case in Kolender v. Lawson, supra, 461 U.S. 352, wherein the Supreme Court upheld a vagueness challenge to an antiloitering statute (former § 647e) that had been construed to require a person to present "credible and reliable" identification *718 when stopped by police. The high court found the statute unconstitutional because it vested virtually complete discretion in police officers to determine whether an individual had complied with the statute. (Kolender v. Lawson, supra, 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910].)
Here, by contrast, the conduct punished by sections 422.6 and 422.7 is objectively clear, and its discriminatory motivation is an element that must be proved beyond a reasonable doubt. (Cf. People v. Superior Court (Caswell) (1988) 46 Cal.3d 381, 394 [250 Cal. Rptr. 515, 758 P.2d 1046] [upholding antiloitering statute against vagueness challenge].) That the motivation often must be proved by circumstantial evidence merely renders the hate crimes statutes similar in this respect to many other penal laws.
Significantly, as we determined above, section 422.6 requires proof that defendants willfully engaged in the prohibited conduct, and section 422.7 requires evidence the crime was committed for the purpose of interfering with the exercise of legally protected rights. The United States Supreme Court has emphasized the value of a specific intent requirement in mitigating potential vagueness of a statute. (People v. Superior Court (Caswell), supra, 46 Cal.3d at p. 391, citing Hoffman Estates v. Flipside, Hoffman Estates (1982) 455 U.S. 489, 499 [71 L.Ed.2d 362, 372, 102 S.Ct. 1186]; Dennis v. United States (1951) 341 U.S. 494, 515 [95 L.Ed. 1137, 1155-1156, 71 S.Ct. 857] ["[A] claim of guilelessness ill becomes those with evil intent."]; Screws v. United States, supra, 325 U.S. 91, 104 [89 L.Ed. 1495, 1504] ["`A mind intent upon willful evasion is inconsistent with surprised innocence.'"].) Inasmuch as "`[w]ords inevitably contain germs of uncertainty,'" mathematical precision in the language of a penal statute is not a sine qua non of constitutionality. (U.S. v. Gilbert, supra, 813 F.2d at p. 1530, quoting Broadrick v. Oklahoma, supra, 413 U.S. at p. 608 [37 L.Ed.2d at p. 837].) One who willfully threatens violence against another, motivated by the victim's protected characteristic, cannot later be heard to complain he or she was unaware such conduct might violate sections 422.6 and 422.7.

"Because of"
As noted above, the Court of Appeal construed the phrase "because of," as used in sections 422.6 and 422.7, to require the prohibited bias to be a "substantial factor" in the commission of the offense. The court rejected the minors' argument the statutes should be read as requiring proof the offense would not have been committed but for the prohibited bias, but believed the statutes should not apply when bias is merely a minor factor in the perpetrator's decision to select the victim. The minors renew their contention sections 422.6 and 422.7 require proof of "but-for" causation, while the *719 Attorney General argues that to obtain a conviction the prosecution should be required to prove only that the bias motivation "contributed to" or was "a factor in" the offense.
Our purpose, as in every case of statutory construction, is to discover and effectuate the legislative purpose in enacting sections 422.6 and 422.7. The statutes require proof, inter alia, that the offense was committed because of the perpetrator's racial, religious or other specified bias. As used in sections 422.6 and 422.7, and as a matter of common usage, "because of" means the conduct must have been caused by the prohibited bias.[7] A cause is a condition that logically must exist for a given result or consequence to occur. (American Heritage Dict. (2d ed. 1982) p. 249.)
One can articulate, then, the parameters of the expressed bias sections 422.6 and 422.7 target. On one hand, the Legislature has not sought to punish offenses committed by a person who entertains in some degree racial, religious or other bias, but whose bias is not what motivated the offense; in that situation, it cannot be said the offense was committed because of the bias. On the other hand, nothing in the text of the statute suggests the Legislature intended to limit punishment to offenses committed exclusively or even mainly because of the prohibited bias. A number of causes may operate concurrently to produce a given result, none necessarily predominating over the others. By employing the phrase "because of" in sections 422.6 and 422.7, the Legislature has simply dictated the bias motivation must be a cause in fact of the offense, whether or not other causes also exist. (Cf. In re Sassounian (1995) 9 Cal.4th 535, 549, fn. 11 [37 Cal. Rptr.2d 446, 887 P.2d 527] [to satisfy national origin special circumstance, § 190.2, subd. (a)(16), killing need not have been solely because of victim's "nationality or country of origin"].) When multiple concurrent motives exist, the prohibited bias must be a substantial factor in bringing about the crime. (People v. Caldwell (1984) 36 Cal.3d 210, 220 [203 Cal. Rptr. 433, 681 P.2d 274] ["`[N]o cause will receive juridical recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a substantial factor in *720 bringing about the particular result'"]; cf. CALJIC No. 3.41 (1992 rev.).) These principles accord with traditional rules of causation in criminal cases (see People v. Roberts (1992) 2 Cal.4th 271, 313 [826 P.2d 274, 6 Cal. Rptr.2d 276]; People v. Temple (1993) 19 Cal. App.4th 1750, 1754-1756 [24 Cal. Rptr.2d 228]) and are sufficiently clear to withstand any claim of vagueness. (Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1052 [1 Cal. Rptr.2d 913, 819 P.2d 872]; cf. United States v. Bledsoe (8th Cir.1984) 728 F.2d 1094, 1098 [76 A.L.R.Fed. 807].)

Section 422.6  Content-based Regulation?
(9a) The minors contend section 422.6, even if limited in its application to true threats, is a content-based regulation of speech impermissible under the First Amendment as explicated by the United States Supreme Court in R.A.V. v. St. Paul, supra, 505 U.S. 377 [120 L.Ed.2d 305] (R.A.V.). They argue that threats "addressing specific protected characteristics or disfavored topics" are punished, while other threats, no matter how damaging or fear inducing, are left unpunished. This, they urge, selectively silences speech in a way the Constitution forbids. We disagree with the minors' characterization of section 422.6.
In R.A.V., the high court invalidated, as impermissibly content and viewpoint based, a St. Paul, Minnesota, ordinance providing as follows: "Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor." (R.A.V., supra, 505 U.S. at p. 380 [120 L.Ed.2d at p. 315].)
(10), (9b) Content-based regulations of speech, the high court observed, are presumptively invalid. (505 U.S. at p. 382 [120 L.Ed.2d at p. 317].) The rationale of this general prohibition is that content discrimination "`rais[es] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" (Id. at p. 387 [120 L.Ed.2d at p. 320], quoting Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd. (1991) 502 U.S. 105, 116, [116 L.Ed.2d 476, 487, 112 S.Ct. 501].) First Amendment jurisprudence, however, has recognized certain categories of speech (e.g., obscenity, fighting words, threats and defamation) as lacking the full extent of constitutional protection and thus regulable for reasons related to their constitutionally proscribable content. (505 U.S. at p. 383 [120 L.Ed.2d at pp. 317-318].) In these contexts of proscribable speech, the prohibition against content discrimination is not absolute. (Id. at p. 387 [120 *721 L.Ed.2d at p. 320].) When the nature of a particular content discrimination is such that there is "no realistic possibility that official suppression of ideas is afoot," regulation of proscribable speech will survive constitutional scrutiny. (R.A.V., supra, 505 U.S. at p. 390 [120 L.Ed.2d at p. 322].)
The high court concluded the St. Paul ordinance was constitutionally defective because, although facially limited to the category of proscribable fighting words, in practical operation it applied only to fighting words that insult or provoke violence on the basis of race, color, creed, religion or gender. (R.A.V., supra, 505 U.S. at p. 391 [120 L.Ed.2d at p. 323].) The St. Paul ordinance thus went beyond mere content discrimination to actual viewpoint discrimination. (Ibid.) The ordinance handicapped those advocating racism, sexism or other prohibited bias, while imposing no comparable stricture on opponents of those views. (Ibid. ["St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensb[er]ry rules."].)
Section 422.6 is dissimilar in crucial respects to the St. Paul ordinance invalidated in R.A.V., supra, The latter proscribed the use of "a symbol, object, appellation, characterization or graffiti ... which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others" (St. Paul, Minn., Legis. Code, § 292.02 (1990), italics added) on the basis of the enumerated characteristics  under any analytical framework, a direct regulation of the content of expression. Section 422.6, subdivision (a), by contrast, prohibits willful "injur[y], intimidat[ion], interfer[ence] with, oppress[ion], or threat[s]" against another person in the exercise of a constitutional or statutory right, by force or threat of force, because of the person's race or other protected characteristic  activities, in themselves, clearly falling closer to the conduct end of the expression/conduct continuum, even though in some circumstances they may be intended to convey some expressive content. Subdivision (c) of section 422.6, moreover, insofar as it may regulate speech, delimits punishable speech to the proscribable category of true threats, as discussed above.[8]
The minors, however, assert section 422.6 is an impermissible content-based regulation of speech because threats "addressing specific protected *722 characteristics or disfavored topics are punished" (italics added), while other threats are left unpunished. The minors do not accurately characterize the statute. Section 422.6 has nothing to say about the topic of a punishable threat of violence. Nor does it attempt to proscribe a threat that "addresses" any particular characteristic of any person or group of persons. What it does, rather, is to carve out the proscribable speech category consisting of threats of violence and punish such threats when motivated by prohibited bias. Read as a whole, section 422.6 is a statute analogous to a type mentioned in R.A.V.  "a prohibition of fighting words [here, threats] that are directed at certain persons or groups (which would be facially valid if it met the requirements of the Equal Protection Clause)...." (R.A.V., supra, 505 U.S. at p. 392 [120 L.Ed.2d at p. 323].) What section 422.6 generally prohibits is conduct consisting of willful interference with another person in his or her exercise of constitutional or statutory rights by means of force or threat of force, the conduct being undertaken because of the actor's bias. The statutory aim and effect are not suppression of speech, but the protection of individuals in the exercise and enjoyment of their rights. Proscribable speech (threats of violence made by a speaker having the apparent ability to carry them out) falls constitutionally within the reach of the statute. (Cf. Wisconsin v. Mitchell, supra 508 U.S. ___ [124 L.Ed.2d 436].)
Section 422.6 also satisfies the test enunciated in United States v. O'Brien (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673] (O'Brien), which provides a useful framework for analyzing the constitutionality of governmental regulation of conduct having potential expressive content. (See Grannis, Fighting Words and Fighting Freestyle: The Constitutionality of Penalty Enhancement for Bias Crimes (1993) 93 Colum. L.Rev. 178, 179; Note (1993) 107 Harv. L.Rev. 144, 234, 241-244.) In O'Brien, the defendant, an antiwar protester, was prosecuted under 50 United States Code Appendix section 462(b), a statute prohibiting destruction or mutilation of draft cards. The high court rejected his claim the statute violated the First Amendment by punishing "symbolic speech." The court noted "when `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.... [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest." (O'Brien, supra, 391 U.S. at pp. 376-377 [20 L.Ed.2d at pp. 679-680].) The court concluded the statute under which O'Brien was prosecuted met the foregoing criteria and thus satisfied constitutional requirements.
*723 Section 422.6 likewise meets all of the O'Brien criteria. The state doubtless possesses the constitutional authority to protect the legal rights of its inhabitants by punishing those who commit a particular type of willful interference with another person in the exercise of such rights, i.e., interference by means of force or the threat of force, done because of the other person's protected characteristic. Its interest in doing so is both substantial and important and, as we have seen, unrelated to the suppression of free expression. Finally, no means less restrictive of First Amendment freedoms to accomplish that end appear. (Cf. American Life League, Inc. v. Reno (4th Cir.1995) 47 F.3d 642, 648-650 [applying intermediate scrutiny to content-neutral Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248].)
The high court in R.A.V. observed that when the state does not "target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." (R.A.V., supra, 505 U.S. at p. 390 [120 L.Ed.2d at p. 322]; see also Roberts v. United States Jaycees (1984) 468 U.S. 609, 628 [82 L.Ed.2d 462, 478, 104 S.Ct. 3244] ["acts of invidious discrimination [] (like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection."].) Examples of such permissible regulation include title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a), (m)), which prohibits discrimination in the workplace based on an employee's race, color, religion, sex or national origin; 18 United States Code section 242, which criminalizes conduct attempting to deprive individuals of their civil or constitutional rights on the basis of race, color or alienage; and 42 United States Code sections 1981 and 1982, which provide civil remedies for discrimination in a multiplicity of settings. These statutes may be violated by speech as well as conduct. (See, e.g., Meritor Savings Bank v. Vinson (1986) 477 U.S. 57, 63-67 [91 L.Ed.2d 49, 57-60, 106 S.Ct. 2399] [sex discrimination in workplace may consist of words creating hostile work environment]; Thronson v. Meisels (7th Cir.1986) 800 F.2d 136, 140 [evidence of landlord's statements supported jury's finding of violation of 42 U.S.C. § 1982 by discrimination in housing].) By parity of reasoning, threats, intimidation and interference with the exercise of legal rights because of the victim's protected characteristic are not shielded from punishment merely because the actor espouses a bigoted philosophy.
Section 422.6 punishes the discriminatory threat of violence, not the thought behind it. (Cf. In re Joshua H., supra, 13 Cal. App.4th at p. 1749 [upholding § 422.7 against 1st Amend. challenge].) Wide channels remain open for expression of racist, homophobic and other discriminatory ideas. *724 Thus, even if the minors were correct that section 422.6 regulates expression on the basis of content, which we reject, the prohibition on discriminatory threats of violence contained in section 422.6 does not present a "realistic possibility that official suppression of ideas is afoot." (R.A.V., supra, 505 U.S. at p. 390 [120 L.Ed.2d at p. 322].) It is not, therefore, an unconstitutionally selective content-based regulation of speech under R.A.V., supra, 505 U.S. 377 [120 L.Ed.2d 305].

Section 422.7 and Wisconsin v. Mitchell
(11) Section 422.7 raises to felony status a bias-motivated misdemeanor committed against another's person or property for the purpose of intimidating or interfering with that person's free exercise or enjoyment of a statutory or constitutional right. In Wisconsin v. Mitchell, supra, 508 U.S. ___ [124 L.Ed.2d 436] (Mitchell), the high court upheld, against First Amendment challenge, a statute that enhances punishment for misdemeanors when the offender intentionally selects the victim because of his or her race, religion or other specified characteristic.[9] The court rejected the contention the statute impermissibly punished bigoted thought and not conduct. (508 U.S. at p. ___ [124 L.Ed.2d at pp. 444-447].) Sentencing judges, the court observed, traditionally have considered a wide variety of factors, including the defendant's motive, in determining the proper sentence. It cautioned, however, a defendant's abstract beliefs, no matter how obnoxious, may not figure in sentence selection. (Id. at p. ___ [124 L.Ed.2d at p. 445]; see Payne v. Tennessee (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]; Barclay v. Florida (1983) 463 U.S. 939, 949 [77 L.Ed.2d 1134, 1143-1144, 103 S.Ct. 3418] [defendant's racial animus against victim a proper consideration in sentencing defendant to death]; Dawson v. Delaware (1992) 503 U.S. 159, 165-168 [117 L.Ed.2d 309, 315-319, 112 S.Ct. 1093] [defendant's First Amendment rights violated by admission of evidence in capital trial *725 penalty phase that he was a member of a White supremacist prison gang].) The Mitchell court distinguished R.A.V., supra, 505 U.S. 377 [120 L.Ed.2d 305], noting the ordinance considered in R.A.V. was explicitly directed at expression, while the Wisconsin statute at issue in Mitchell was aimed at conduct unprotected by the First Amendment. (508 U.S. at p. ___ [124 L.Ed.2d at p. 447].)
Although Mitchell upheld a hate crime sentence enhancement against First Amendment challenge, the minors argue it cannot validate section 422.7, because section 422.7 applies to such "expression-based" misdemeanors as violations of section 415[10] and may lead to discrimination on the basis of content. Thus it is overbroad, they contend.
We are unpersuaded by the minors' contention. An "expression-based" misdemeanor generally may not constitutionally be punished except in a content-neutral way. (R.A.V., supra, 505 U.S. at pp. 385-386 [120 L.Ed.2d at pp. 317-318].) In Mitchell the United States Supreme Court expressly noted the Wisconsin statute it upheld was "similar" to section 422.7. (Mitchell, supra, 508 U.S. at p. ___ [124 L.Ed.2d at p. 443, fn. 4].) The minors' challenge to section 422.7 fails for the same reason the challenge in Mitchell failed: the statute does not impinge on freedom of expression, but rather, increases punishment for misdemeanors committed because of prohibited bias motivation. In such a case, the conduct is punishable in the first instance, if at all, for reasons unrelated to its expressive content, and the enhancement is proper under Mitchell to sanction bias-motivated conduct, not expression. (See R.A.V., supra, 505 U.S. at p. 388 [120 L.Ed.2d at pp. 319-321]; Mitchell, supra, 508 U.S. at p. ___ [124 L.Ed.2d at p. 447].) If in a particular case prosecution for an "expression-based" misdemeanor, such as section 415, were based discriminatorily on the content of the defendant's speech, then the fault would lie with the application to that case of section 415, not with section 422.7. Section 422.7 is therefore not overbroad. Even if it were possible to conjure some potential overbreadth in the statute, it *726 does not amount to the kind of substantial overbreadth required to invalidate a statute. (Broadrick v. Oklahoma, supra, 413 U.S. at p. 615 [37 L.Ed.2d at pp. 841-842].)

Application of Section 654
(12) A.G. argues the term imposed for violation of section 422.6 should have been stayed, pursuant to section 654,[11] because the acts underlying that violation were the same as those underlying the assault charges. The Court of Appeal rejected her contention. It began its analysis by observing that when a defendant's violent conduct affects multiple victims, section 654 does not apply, so that his or her greater culpability may receive commensurate punishment. (People v. McFarland (1989) 47 Cal.3d 798, 803 [254 Cal. Rptr. 331, 765 P.2d 493].) Citing the Legislature's determination that hate crimes injure members of the protected class and society more severely than do random crimes and are more likely to lead to escalations of violence, the court reasoned the "victims" of the minor's crimes included the larger community, thus invoking the multiple-victims exception to section 654. The Court of Appeal also observed the sentencing court imposed no commitment time for the section 422.7 "enhancements" found true as to A.G. Whatever the relevance of the latter point, the Court of Appeal evidently believed punishing A.G. for violation of section 422.6, in addition to the assault and battery, would not contravene the purposes underlying section 654.
The Attorney General argues the Court of Appeal found, in essence, the Legislature "implicitly exempted" section 422.6 from the operation of section 654, because the impact of the harm resulting from hate crimes extends beyond the immediate victims to the larger community. He urges us to adopt the same reading of the statute.
We are unpersuaded. The Attorney General in effect argues the Legislature intended an implied repeal of section 654, insofar as it would otherwise apply in prosecutions under section 422.6. As a general rule of statutory construction, however, repeal by implication is disfavored, particularly when the assertedly repealed statute, like section 654, has been part of our penal jurisprudence for over a century. (People v. Siko (1988) 45 Cal.3d 820, 824 [248 Cal. Rptr. 110, 755 P.2d 294]; see Kennedy Wholesale, Inc. v. State Bd. of Equalization (1991) 53 Cal.3d 245, 249 [279 Cal. Rptr. 325, 806 P.2d 1360].) We are directed to no legislative history suggesting the enactment of section 422.6 was accomplished with an intent impliedly to repeal section *727 654. The Legislature's general observations about the harm wrought by hate crimes on society sufficiently explain its motivation in passing section 422.6 and related laws, but suggest nothing in the way of an intent to override section 654. The Attorney General, moreover, cites no authority to establish how the court's failure to impose commitment time for the section 422.7 finding might rectify a failure to stay punishment for A.G.'s violation of section 422.6. We conclude, therefore, the Court of Appeal erred in finding section 654 inapplicable.
To say the Court of Appeal's analysis of the section 654 issue was erroneous is not to say, however, that minor A.G. is necessarily entitled to a reduction of her maximum commitment time. That determination depends on whether the conduct underlying the "true" finding on the section 422.6 count is the same as that underlying the other counts. As noted above (see fn. 3, ante), the record is not altogether clear on this point. Accordingly, proper resolution of this issue requires a limited remand to the juvenile court.

Sufficiency of Pleadings and Evidence
(13) Sections 422.6 and 422.7, as we have seen, require a specific intent to interfere with the victim's enjoyment of a defined civil or constitutional right because of his or her protected characteristic. (Lashley, supra, 1 Cal. App.4th at p. 949.) The minors contend the juvenile court's findings must be reversed because the accusatory pleading failed to provide adequate notice of the particular right they interfered with, the juvenile court failed to rectify that omission, and the record contains no evidence of the required intent.
We reject the minors' contention at the threshold because they failed to raise it either in the Court of Appeal[12] or in their petition for review. (Cal. Rules of Court, rules 28(e)(2), 29(b)(1).) Were we to reach the merits, we would likewise reject it. The pleadings allege, as to each minor, assault with a deadly weapon (counts 1 and 2) and battery (count 3), as well as violation of section 422.6 by "the use of force and threat of force" (count 4). This language sufficiently advised the minors of the nature of the rights they were alleged to have violated, namely, the victims' right to be free from personal violence. (See Civ. Code, § 43; Lashley, supra, 1 Cal. App.4th at p. 950.) Our review of the record confirms the juvenile court's findings were supported by sufficient evidence. As recited above, the victims testified to the violence and threats of violence committed by the minors, together with the antigay *728 epithets they uttered, evidencing prohibited bias motivation. On this record, the juvenile court could reasonably find the minors acted with the specific intent required by sections 422.6 and 422.7.

CONCLUSION
To ensure correct application of section 654 in the calculation of minor A.G.'s maximum commitment time, as to A.G. alone the matter is remanded to the juvenile court for further proceedings consistent with the opinion of this court. In all other respects the judgment of the Court of Appeal is affirmed.
Lucas, C.J., Arabian, J., Baxter, J., and George, J., concurred.
MOSK, J.
I concur in the judgment. The majority's disposition is correct, and I join in it. But I cannot agree with the majority's analysis of Penal Code sections 422.6 and 422.7 (all statutory references are to this code).

I.
The majority have misconstrued the intent requirement of section 422.6 in a manner that will make prosecuting hate crimes more difficult.
Section 422.6 provides, "No person ... shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any ... person" exercising his or her personal liberties "because of the other person's race, color, religion, ancestry, national origin, disability, gender, or sexual orientation, or because he or she perceives that the other person has one or more of those characteristics." (Id., subd. (a).) With regard to acts consisting purely of speech  i.e., threats  a showing is required that "the speech itself threatened violence against a specific person or group of persons and ... the defendant had the apparent ability to carry out the threat." (Id., subd. (c).)
In other words, section 422.6 does no more than punish threats of violence, assaults or batteries made or committed for a particularly base motive. By contrast, the majority interpret the statute as requiring an intent to "interfere with a person's right protected under state or federal law"  i.e., his or her civil rights. (Maj. opn., ante, p. 713.) The statute contains no such requirement.
The majority evidently take this unfortunate step because they discern a First Amendment impediment to the enforcement of section 422.6 if they do *729 not read the foregoing intent requirement into it. There is, however, no such impediment. The Legislature can proscribe "threat[s] of force" (id., subd. (a)) without running afoul of the Constitution. The First Amendment confers no protection on threats of violence. (Madsen v. Women's Health Center (1994) 512 U.S. ___, ___ [129 L.Ed.2d 593, 613, 114 S.Ct. 2516]; R.A.V. v. St. Paul (1992) 505 U.S. 377, 388 [120 L.Ed.2d 305, 321, 112 S.Ct. 2538].)

II.
Section 422.6 requires as the mental state an intent to injure. That is all. It does not use the phrase "specific intent." Indeed, "specific intent" and "general intent" do not define criminal mental states. Rather, they are essentially "labels" attached to particular crimes to identify them as admitting ("specific intent") or not admitting ("general intent") the defense of voluntary intoxication. (People v. Cain (1995) 10 Cal.4th 1, 83-84 [40 Cal. Rptr.2d 481, 892 P.2d 1224] (conc. opn. of Mosk, J.), following People v. Hood (1969) 1 Cal.3d 444, 455-456 [82 Cal. Rptr. 618, 462 P.2d 370]; see People v. Whitfield (1994) 7 Cal.4th 437, 463 [27 Cal. Rptr.2d 858, 868 P.2d 272] (conc. & dis. opn. of Mosk, J.).) There is no need to attach one of the labels here. The issue is not implicated before this court. Indeed, there is a need not to attach either label. "Specific intent" and "general intent" have been "`notoriously difficult ... to define and apply,'" and "have proved to be mischievous." (People v. Cain, supra, 10 Cal.4th at p. 84 (conc. opn. of Mosk, J.), quoting People v. Hood, supra, 1 Cal.3d at p. 456.) They should not be employed in analyzing section 422.6.
Section 422.7 provides an enhancement under certain circumstances for a misdemeanor motivated by hatred for the victim and committed "for the purpose of intimidating or interfering with that other person's" constitutionally or statutorily protected liberties. The mental state required is that of "purpose." The majority also affix the label "specific intent" to the enhancement defined by section 422.7, but the statute nowhere contains those words. As is true with regard to section 422.6, the use of such a label is "mischievous." (People v. Cain, supra, 10 Cal.4th at p. 84 (conc. opn. of Mosk, J.).)
Although the majority's analysis is flawed, the disposition is correct. I therefore concur in the judgment.
KENNARD, J.
I concur in the majority opinion and in the judgment. I write separately to state my understanding of one part of our decision in this case: the construction of the words "because of" as they are used in Penal Code sections 422.6 and 422.7.
Penal Code section 422.6 defines a criminal offense. At the time of the conduct at issue here, the offense was defined as using force or the threat of *730 force to injure, intimidate or interfere with, oppress, or threaten another person in the exercise of that person's civil rights "because of the other person's race, color, religion, ancestry, national origin, or sexual orientation." (Italics added.) Penal Code section 422.7 is a penalty enhancement provision. At the time relevant here, it increased the punishment for a misdemeanor if it was committed against the person or property of another for the purpose of interfering with the other person's exercise of civil rights "because of the other person's race, color, religion, ancestry, national origin, or sexual orientation...." (Italics added.) Thus, an element common to these two "hate crime" provisions is that the defendant have acted "because of" the victim's statutorily enumerated characteristic.
Deceptively simple in appearance, the words "because of" as used in these criminal statutes mask a host of difficult problems. These problems may generally be divided into two categories: problems of proof and problems of interpretation.
Consider first the problems of proof. Because of the complexity of the human mind, determining why a person has acted in a given situation is extremely difficult, even with the person's full cooperation. Not infrequently, motives for certain actions remain a mystery, even to the actor. In the context of a criminal trial, the prosecution cannot require the defendant to testify, and therefore must look to the defendant's out-of-court statements and conduct to demonstrate a motive or motives for the defendant's behavior. But the use of a defendant's past statements and associations to prove motive, if not carefully controlled, may have a chilling effect on First Amendment freedoms, and thus the inquiry generally must be confined to statements or conduct of the defendant reasonably close in time or context to the charged acts.
If these problems of proof are overcome, and all of a defendant's motives are ferreted out, there will still be problems of interpretation. Very often, motives prohibited by the statute will have combined in the defendant's mind with other more commonplace motives completely unrelated to the victim's statutorily enumerated characteristics. Again, First Amendment concerns are present. The more attenuated the relationship between the bias motive and the behavior, the greater the risk that the statutory punishment (or increase in punishment) is effectively being imposed for the defendant's bigoted thoughts or beliefs or expressions rather than for the behavior. (See generally, Weinstein, Hate Crime and Punishment: A Comment on Wisconsin v. Mitchell (1994) 73 Ore. L.Rev. 345.) When presented with this "mixed motives" situation, how is the jury to determine whether the defendant has acted "because of" the motives that the statutes condemn?
*731 Addressing this latter problem, the majority arrives at the following conclusions about the meaning of the term "because of" in Penal Code sections 422.6 and 422.7: (1) bias or hatred toward one or more of the enumerated groups need not be the predominant or exclusive motive for the defendant's conduct; (2) a bias motivation must be a "cause in fact" of the defendant's conduct; and (3) if the defendant also had other independent nonbias motives for the conduct, the bias motive must have been a "substantial factor" in producing the defendant's behavior. (Maj. opn., ante, at pp. 716, 718-720.)
In adopting these conclusions, the majority follows the generally accepted analytical path of using the language of causation developed primarily in tort law to define the role that a bias motivation must play before conduct may be sanctioned as discriminatory.[1] The terms "cause in fact" and "substantial factor" have established meanings in tort law. By using those terms here, the majority has adopted those tort law meanings.

"Cause in Fact"
In tort law, a person's conduct is a "cause in fact" of another's injury if the injury would not have occurred in the absence of that conduct. This is generally referred to as the "but for" test of causation. As this court has recognized, the "but for" test works well in most situations, but it should not be used "when two `causes concur to bring about an event and either one of them operating alone could have been sufficient to cause the result [citation].'" (Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1049 [1 Cal. Rptr.2d 913, 819 P.2d 872], quoting Vecchione v. Carlin (1980) 111 Cal. App.3d 351, 359 [168 Cal. Rptr. 571], italics added; see also Prosser & Keeton, The Law of Torts (5th ed. 1984) § 41, p. 266 [stating that a test other than "but for" is needed when "two causes concur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result"].) The most common illustration of concurrent causation is two fires of independent origin that join before destroying property. Under the "but for" test of causation, neither fire would be a "cause in fact" of the property's destruction (because either would have caused the loss in the other's absence), and thus persons responsible for the fires would escape *732 legal responsibility.[2] To avoid this improper result, the definition of "cause in fact" must be expanded to include a second and alternative test, in addition to the "but for" test. Thus, conduct is deemed to be a "cause in fact" of another's injury if either (1) the injury would not have occurred "but for" the conduct, or (2) the conduct would have been sufficient to produce the injury in the absence of other independent forces operating concurrently.
The Restatement Second of Torts, in section 432, gives essentially the same definition of "cause in fact," in these words:
"(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
"(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about." (Italics added.)
This definition of "cause in fact," developed to determine when one individual's conduct should be deemed a cause of another's injury or loss, must now be adapted to the context of motives as a cause of behavior. When a person has acted to deprive another of civil rights, and the evidence reveals both bias and nonbias motives, the bias motives will be a "cause in fact" of the conduct if either (1) the conduct would not have occurred in the absence of the bias motives, or (2) the bias and nonbias motives are independent of each other and the bias motives would have been sufficient to produce the conduct even in the absence of all nonbias motives. Under our decision today, as I understand it, this is what the prosecution must prove to establish that the bias motivation was a "cause in fact" of conduct charged under Penal Code section 422.6 or 422.7.

*733 "Substantial Factor"

In tort law, a finding that the defendant's negligence was a "cause in fact" of the plaintiff's injury does not end the causation inquiry. A person's conduct may be a "cause in fact" of another's injury and yet not be a legally sufficient cause. In addition to simple causality, legal causation in tort law incorporates "our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient." (Prosser & Keeton, op. cit. supra, § 41, p. 264; see Mitchell v. Gonzales, supra, 54 Cal.3d 1041, 1057-1058 (dis. opn. of Kennard, J.).) This second level of causation inquiry has traditionally gone by the name of "proximate cause." Because that term has been thought to overemphasize the importance of physical and temporal proximity in making the evaluation, it has in recent years given ground to the term "substantial factor."[3] Thus, negligent conduct will be deemed a legally sufficient cause of another's injury only if it is (1) a "cause in fact" of the injury (as defined above), and (2) a "substantial factor" in producing the injury.
Like "cause in fact," this concept of "proximate cause" or "substantial factor" must be translated from the realm of tort law, where it describes a relationship between one person's conduct and another's injury, to the particular context at issue here, where it will be used to define the necessary relationship between a person's motives and the same person's actions. The majority does not undertake to define when an individual's bias motivation, having been found to be a "cause in fact" of that individual's conduct, can properly be said also to be a "substantial factor" in producing that conduct, generally deeming the term "substantial factor" to be self-defining. I agree that greater precision, although certainly desirable, is not constitutionally required and may well be impossible.
In the end, we must rely on the jury, with its inherent sense of fairness and justice, to use the "substantial factor" requirement in a way that appropriately accommodates the competing interests: on the one hand, deterring discriminatory conduct; on the other, preserving our First Amendment commitment to freedom of thought and speech. Perhaps the most that can be said is that when the defendant has entertained both discriminatory and nondiscriminatory motives, and either alone would have been sufficient to produce the behavior, the defendant should not be found to have acted "because of" the victim's statutorily enumerated characteristic if nonbias motives so *734 predominated over the bias motives that imposing a punishment designed particularly for bias-motivated conduct would be inherently unfair and would come perilously close to punishing improper thoughts or beliefs.
With this understanding of our decision today, I concur in the majority opinion.
NOTES
[1] Further statutory references, unless otherwise noted, are to the Penal Code.

At the time of the offense, section 422.6 provided in relevant part as follows: "(a) No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States because of the other person's race, color, religion, ancestry, national origin, or sexual orientation. [¶ ... [¶ (c) Any person convicted of violating subdivision (a) or (b) shall be punished by imprisonment in a county jail not to exceed one year, or by a fine not to exceed five thousand dollars ($5,000), or by both that imprisonment and fine. However, no person shall be convicted of violating subdivision (a) based upon speech alone, except upon a showing that the speech itself threatened violence against a specific person or group of persons and that the defendant had the apparent ability to carry out the threat."
At the time of the offense, section 422.7 provided in relevant part as follows: "Except in the case of a person punished under Section 422.6, any crime which is not made punishable by imprisonment in the state prison shall be punishable by imprisonment in the state prison or in a county jail not to exceed one year, by a fine not to exceed ten thousand dollars ($10,000), or both that imprisonment and fine, if the crime is committed against the person or property of another for the purpose of intimidating or interfering with that other person's free exercise or enjoyment of any right secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States and because of the other person's race, color, religion, ancestry, national origin, or sexual orientation, under any of the following circumstances, which shall be charged in the accusatory pleading: [¶] (a) The crime against the person of another either includes the present ability to commit a violent injury or causes actual physical injury."
Sections 422.6 and 422.7 are part of the Tom Bane Civil Rights Act (the Bane Act), enacted by the Legislature in 1987 in response to the alarming escalation in the incidence of hate crimes in California and the inadequacy of existing laws to deter and punish them. (See In re Joshua H. (1993) 13 Cal. App.4th 1734, 1748, fn. 9 [17 Cal. Rptr.2d 291].)
Sections 422.6 and 422.7 were subsequently amended to add gender and disability to the list of protected characteristics and to expressly apply, in addition, to violations committed because the defendant perceived the victim to have one or more of the protected characteristics. (Stats. 1991, ch. 607, §§ 5, 6; Stats. 1991, ch. 1184, §§ 1.5, 2.5; Stats. 1994, ch. 407, §§ 2, 3.)
[2] Because the question was not preserved, this case does not require us to address the propriety of joining enhancement allegations under section 422.7 to "wobblers" such as those charged here. We note that since the date of these offenses, the Legislature has enacted section 422.75, providing for enhancement of felonies committed because of a prohibited bias motive.
[3] The record is unclear as to how A.G.'s maximum commitment time was calculated or the factual basis of the section 422.6 count.
[4] The statute under which Kelner was convicted, 18 United States Code section 875(c), prohibited the "transmi[ssion] in interstate commerce [of] any communication containing ... any threat to injure the person of another...."
[5] This conclusion is consistent with section 7, which provides in relevant part as follows: "The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context: [¶] 1. The word `willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." (Italics added.)

The legislative history of the Bane Act makes clear the act derives from the federal and Massachusetts statutes referred to in the text. Those statutes, as noted, have been interpreted to require the kind of specific intent discussed above. When a state statute is modeled on a federal statute we presume the Legislature intended to adopt the construction employed by the federal courts. (People v. Simon (1995) 9 Cal.4th 493, 511 [37 Cal. Rptr.2d 278, 886 P.2d 1271]; Los Angeles Met. Transit Authority v. Brotherhood of Railroad Trainmen (1960) 54 Cal.2d 684, 688-689 [8 Cal. Rptr. 1, 355 P.2d 905].) Thus, it is sufficiently "apparent from the context" that, as used in the Bane Act, the term "willfully" refers to a specific intent to invade the victim's legally protected rights, by means of threats of violence, because of the victim's protected characteristic. Specific intent in this context does not, however, require the defendant to have been "thinking in constitutional terms." (Screws v. United States, supra, 325 U.S. at p. 106 [89 L.Ed. at p. 1505].) We adopt this reading of section 422.6 as a matter of statutory construction, not constitutional requirement.
[6] American Civil Liberties Union Foundation of Northern California, Inc., and American Civil Liberties Union Foundation of Southern California, Inc.
[7] The several opinions of the United States Supreme Court in Price Waterhouse v. Hopkins (1989) 490 U.S. 228, 240 [104 L.Ed.2d 268, 281, 109 S.Ct. 1775] (plur. opn. of Brennan, J.), 262-263 [104 L.Ed.2d at pp. 295-296] (conc. opn. of O'Connor, J.), 281 [104 L.Ed.2d at pp. 307-308] (dis. opn. of Kennedy, J.), an employment discrimination action, reflect some disagreement over the meaning and especially the procedural implications of the term "because of," as used in title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)). Nonetheless, no member of the high court registered dissent from the fundamental premise that the statutory language refers to a causal link between motive and act, and the decision's primary significance lay in its allocation of the proof burdens between the respective parties, an issue not presented in this case arising under the penal law. As will appear, we interpret the term "because of," as used in section 422.6, and 422.7, in light of traditional rules of causation under our state's criminal law, and find nothing in Price Waterhouse v. Hopkins, supra, dictating a different analysis.
[8] While we are aware the distinction between conduct and expression can be elusive (see, e.g., Lawrence, Resolving the Hate Crimes/Hate Speech Paradox: Punishing Bias Crimes and Protecting Racist Speech (1993) 68 Notre Dame L.Rev. 673, 691-694 [criticizing reliance on the distinction between conduct and expression]), and First Amendment analysis clearly cannot stop with a facile categorization of a governmental regulation as affecting "conduct" or "expression," the distinction retains some utility as a preliminary point of reference. (See Kagan, Regulation of Hate Speech and Pornography after R.A.V. (1993) 60 U.Chi. L. Rev. 873, 884.) Notably, the high court in Wisconsin v. Mitchell (1993) 508 U.S. ___ [124 L.Ed.2d 436, 113 S.Ct. 2194] itself drew heavily on the distinction between regulation of speech and that of conduct in upholding the constitutionality of a Wisconsin hate crime statute.
[9] At the time of the offense, and as relevant here, the Wisconsin statute provided as follows: "(1) If a person does all of the following, the penalties for the underlying crime are increased as provided in sub. (2): [¶] (a) Commits a crime under chs. 939 to 948. [¶] (b) Intentionally selects the person against whom the crime under par. (a) is committed or selects the property which is damaged or otherwise affected by the crime under par. (a) because of the race, religion, color, disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property. [¶] (2)(a) If the crime committed under sub. (1) is ordinarily a misdemeanor other than a Class A misdemeanor, the revised maximum fine is $10,000 and the revised maximum period of imprisonment is one year in the county jail. [¶] (b) If the crime committed under sub. (1) is ordinarily a Class A misdemeanor, the penalty increase under this section changes the status of the crime to a felony and the revised maximum fine is $10,000 and the revised maximum period of confinement is 2 years. [¶] (c) If the crime committed under sub. (1) is a felony, the maximum fine prescribed by law for the crime may be increased by not more than $5,000 and the maximum period of imprisonment prescribed by law for the crime may be increased by not more than 5 years." (Wis. Stat. § 939.645 (1989-1990).)
[10] Section 415 prohibits, among other acts, using "offensive words in a public place which are inherently likely to provoke an immediate violent reaction." (§ 415, subd. (3).) The minors enumerate additional sections of the Penal Code that may in some circumstances punish as misdemeanors expression or expressive conduct. (§§ 302 [disturbing a religious meeting], 311.2 [production, distribution, or exhibition of obscene matter], 314 [indecent exposure], 403 [disturbance of a public assembly], 404 [riot], 404.6 [incitement to riot], 408 [participation in rout or unlawful assembly], 415.5 [disturbance of the peace of a school], 417 [brandishing a weapon], 602 [trespass], 602.1 [interference with business establishment], 602.10 [obstructing attendance or instruction at state institution of higher learning], 602.11 [obstructing entry or exit of health care facility, place of worship, or school], 603 [forcible entry and vandalism], 605 [removing, altering, or defacing landmarks], 622 [injuring works of art or improvements].) None of the statutes the minors cite is implicated in this case; however, the analysis contained in this portion of the opinion would apply with equal force to all of the cited statutes.
[11] Section 654 provides in relevant part as follows: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one...."
[12] M.S. did raise the pleading issue by demurrer in the juvenile court and in a writ petition to the Court of Appeal, but she did not seek review of that court's summary denial of her petition. A.G. did not raise the pleading issue in any form in the Court of Appeal.
[1] One commentator has challenged the assumption "that the problem of mixed motives is a problem of causation, similar to causation problems in tort law...." (Gudel, Beyond Causation: The Interpretation of Action and the Mixed Motives Problem in Employment Discrimination Law (1991) 70 Tex. L.Rev. 17, 20.) Although the analogy is admittedly not exact, it is sufficiently close to be helpful, at least in the absence of another and superior method of analysis.
[2] The proper result is somewhat less clear when only one of the fires was negligently caused. Although a famous early case declined to impose any liability in that situation (Cook v. Minneapolis, St. P. & S.S.M. Ry. Co. (1898) 98 Wis. 624 [74 N.W. 561]), the consensus now appears to be that liability is properly imposed on the negligent actor, even though the fire of innocent origin would have caused the same loss in any event. (See Prosser & Keeton, op. cit. supra, § 41, p. 267, fn. 26.)

Curiously, courts have generally reached the opposite result when applying a concurrent cause analysis to culpable and nonculpable motives in employment discrimination cases. Thus, when an employee has been discharged or demoted, and the evidence shows that the employer entertained both culpable (that is, discriminatory) and nonculpable motives, the employer can escape liability by proving that it would have taken the same action even without the culpable motive. (See Price Waterhouse v. Hopkins (1989) 490 U.S. 228 [104 L.Ed.2d 268, 109 S.Ct. 1775]; Martori Brothers Distributors v. Agricultural Labor Relations Bd. (1981) 29 Cal.3d 721, 729-730 [175 Cal. Rptr. 626, 631 P.2d 60].)
[3] "Substantial factor" has been used not only as a synonym for "proximate cause" but also as a synonym for "cause in fact." (See Prosser & Keeton, op. cit. supra, § 41, pp. 267-268; id. (1988 pocket supp.), pp. 43-45.) Much unnecessary confusion results from making the same term carry so many related yet distinct meanings.